**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT K.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 C 1586** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act,

42 U.S.C. §§416(I), 423, about seven years ago in February of 2015. (Administrative Record (R.)

207-08). He claimed that he became disabled as of August 20, 2014, vocal chord damage, and

shortness of breath. (R. 238). Over the next two years, the plaintiff's application was denied at every

level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals

council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955;

404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner

seeks an order affirming the decision.

**I.**

**A,**

That ALJ's decision has been before the court for review for a long time. Plaintiff filed suit

for review of the denial of his application back on March 2, 2018, and his case was assigned to

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

Judge Andrea Wood. Plaintiff filed his opening motion on July 2, 2018 [Dkt. #9], but the case was not fully briefed until over four months later on November 14, 2018, following three unopposed motions for extensions of time that Judge Wood granted to the defendant. [Dkt. ##13, 16, 19]. Then, nearly two years passed –there was a brief stay for a government shutdown and three Covid-19 extension orders – until, on September 28, 2020, the Executive Committee reassigned the case to newly appointed Judge Valderrama, along with 370 other cases, and the process of reviewing the record and briefs would have to start over. [Dkt. #32]. At that point, the plaintiff claimed to have been out of work for six years. (R. 21). About nine months after that, on July 16, 2021, the parties themselves decided to start over again and consented to my jurisdiction. [Dkt. 36].

Surely, among the obstacles that have delayed review of this case is the fact that the administrative record is a mess. It's 2210 pages long, and 1900 pages of that is medical evidence. (R. 327-2210). A fair portion of those pages are duplicates and triplicates, and there's no rhyme or reason to how the evidence is organized. That's not really out of the ordinary for these cases, but the manner in which the defendant chose to file the record is. Instead of filing in perhaps three or four chunks, it was filed in 38 short exhibits, none of which come anywhere close to the limit of 30MB.

Not a great deal of that material is pertinent to plaintiff's case, at least not according to plaintiff's brief. The relevant medical evidence goes back to September of 29, 2014, when a CT scan of Plaintiff's cervical spine revealed normal postoperative changes at the C5-T1 levels in connection with prior anterior fusion, minimal facet arthritis at C3-4, some foraminal narrowing at C5-6, moderate to severe foraminal narrowing at C6-7, and mild foraminal narrowing at C7-T1. (R. 336). CT of the thoracic spine showed minimal spondylosis without any significant stenosis. (R.

2

340).  On November 19, 2014, Plaintiff underwent a cervical discectomy and fusion of the C5 through T1 levels. (R. 390-404, 433-36). Upon discharge two days later, Plaintiff was reportedly in stable condition with pain medication and instructions to follow up with physical therapy and his surgeon. (R. 390-393). Immediately after his cervical discectomy, plaintiff had a hoarse voice and right vocal cord paralysis. (R. 391, 394).

Two weeks after surgery, on December 2, 2014, plaintiff's neck pain was gone and he had no symptoms in his upper extremities.  He did have some pain in his thoracic spine.  (R. 414). On December 24, 2014, an MRI of plaintiff's thoracic spine revealed mild thoracic spondylosis without any significant spinal stenosis.  (R. 338-339). On February 10, 2015, an MRI of Plaintiff's lumbar spine revealed mild disc bulges at L2-3, L3-4, and disc bulges causing mild stenosis at L4-5 and L5-S1.  (R. 381 (cited as 338 in plaintiff's brief).  An epidural steroid injection was administered at the L5 level on February 27, 2015. (R. 383-384).

On March 18, 2015, plaintiff's reflexes and gait were normal, as were strength and range of motion throughout.  (R. 454). On April 9, 2015, plaintiff sought treatment after falling and hurting his hip. (R. 459).  He exhibited mild to moderate tenderness along the lumbar spine.  Strength and sensation were normal.  (R. 460). X-rays of plaintiff's lumbar spine revealed grade one retrolisthesis of L3 over the L4 level, mild disc space narrowing at the L5-S1 level, and mild to moderate facet hypertrophy from the L3 level through the S1 level. (R. 461). He was given an injection of Toradol and discharged. (R. 461-462). Plaintiff was flagged for narcotics overuse/drug seeking behavior. (R. 461, 482).

At a follow-up examination on April 14, 2015, plaintiff exhibited normal strength, sensation, and reflexes in all extremities.  Straight leg raising was positive at 60 degrees on the left.  There was

some tenderness in the cervical spine. (R. 410). There was loss of lordosis possibly due to muscle spasm. (R. 411). The doctor noted that Plaintiff had undergone a fusion procedure several months earlier which seemed to have resolved plaintiff's symptoms to a "big extent." (R. 410).

On August 7, 2015, an MRI of plaintiff's lumbar spine revealed normal lordosis, moderate disc height loss, lower lumbar spondylosis, and disc herniation with mild central canal stenosis at the L4-5 level, and disc bulge and mild central canal stenosis at the L5-S1 level. (R. 487-88). Radiology on August 9, 2015 revealed mild disc space narrowing at L5-S1 with mild to moderate facet hypertrophy from L3 through S1. (R. 490). Plaintiff had another epidural injection on August 21, 2015. (R. 507). On August 31, 2015, x-rays of plaintiff's hands were normal aside from a tiny calcification in the joint of the second digit on the right hand. (R. 486).

On April 22, 2015, Dr. Hong, an examining physician at Riverside Medical Center, examined plaintiff and reported an antalgic gait, a limited range of motion in the lumbar and cervical spines, but normal strength, sensation, and reflexes in all extremities. (R. 1324). Plaintiff denied any depression or anxiety. (R. 1324). On August 11, 2015, Dr. Hong noted that plaintiff had an antalgic gait, normal strength, reflexes, and sensation, but a positive straight leg raise on the left at 35 degrees. (R. 1320). Range of motion was limited in the lumbar spine but normal in the cervical spine. (R. 1320). Plaintiff denied any depression or anxiety. (R. 1320). Dr. Hong examined plaintiff again on December 14, 2015. Gait was antalgic and there was limited range of motion in the lumbar spine. But cervical range of motion was again normal, as were strength, sensation, and reflexes in all extremities. (R. 1316). Plaintiff again denied any depression or anxiety. (R. 1316).

On May 14, 2016, plaintiff underwent a consultative physical examination with Dr. William Lopez. (R. 534-542). Plaintiff's gait was non-antalgic and he could heel-toe walk, albeit with mild

4

difficulty. Grip strength was 5/5 in both hands. Range of motion was normal in both extremities. Range of motion in the cervical spine was mildly limited (R. 536, 540). Range of motion in the lumbar spine was limited; flexion was 60 degrees out of 90. (R. 536, 541). Straight leg raise was negative. (R. 536). Strength, sensation, and reflexes were normal throughout. (R. 537). The doctor noted that plaintiff spoke with a hoarse voice. (R. 537).

On August 16, 2016, Plaintiff underwent a micro-direct laryngoscopy and injection with Dr. Akta Kakodkar. (R. 1718-1772). On November 4, 2016, another laryngoscopy was performed, by Dr Kakodkar, after which Plaintiff participated in voice therapy. (R. 1341-1344, 1782). Dr. Kakodkar administered another micro-direct laryngoscopy injection in January 2017. (R. 1355-1358).

On December 29, 2016, Dr. Hong performed a right sided L3-4 and L4-5 transforaminal epidural steroid injection. (R. 1814-1849). Plaintiff underwent a physical therapy regimen thereafter. (R. 1850-1896, 1900, 1979-2004).[2]

Beginning in March 2016, Plaintiff received treatment from psychiatrist Dr. Debra Ciasulli, ( R. 518). Plaintiff reported having "bad thoughts." Dr. Ciasulli noted that plaintiff's affect was depressed, his thought process was logical and linear, his insight and judgment were fair, and his cognition was intact. (R. 520). On April 29, 2016, plaintiff reported medical insurance issues were affecting him. (R. 522). His affect was euthymic, thought process was linear and logical, insight and judgment were fair, and cognition was grossly intact. (R. 523). On May 2, 2016, plaintiff

---

[2] Throughout 2015, Plaintiff participated in physical therapy for his low back impairment. (R. 451-510, 571-670, 950-1056). He had made progress by the end of August, but additional physical therapy was recommended. (R. 528-529). In the latter part of 2015 and early 2016, and again in April, May, and July of 2016, plaintiff received several epidural steroid injections to his lumbar spine. (R. 451-510, 628-629, 653-654, 661-662; 749-801, 863-906, 1525-1541, 1634, 1688-1713).

reported continuing insurance woes. (R. 516). His affect was again euthymic, thought process was linear and logical, insight and judgment were fair, and cognition was grossly intact. (R. 517).

On May 14, 2016, Dr. Kristin Schoenbach conducted a consultative psychological examination. (R. 530-533). Dr. Schoenbach noted plaintiff's concentration and attention appeared impaired, and concentration. He had difficulty with serial sevens testing and was only able to recall five digits forward, but not backward. Judgment was intact. (R. 531). Noting that Plaintiff had reported improvement of his depression with medication, Dr. Schoenbach diagnosed Plaintiff with unspecified depressive disorder. (R. 532).

Plaintiff also went to counseling with therapist Mary Grant in mid-2016. After about two months of sessions, on June 1, 2016, she completed a form from plaintiff's attorney. She reported that plaintiff's symptoms did not restrict his daily activities, but that his social anxiety and panic disorder markedly restricted socialization. (R. 1491). She left the question about whether plaintiff's symptoms markedly restricted his concentration blank, but wrote "insomnia [diagnosis] and sleep apnea [diagnosis]," source statement. (R. 1492). She checked "no" for the question asking whether plaintiff could function in a competitive work setting." (R. 1491).

On November 11, 2016, plaintiff reported to Dr. Ciasulli that his temper was under control; his anxiety was not. (R. 1345). Upon examination, plaintiff's mood was "okay", affect was euthymic, insight and judgment were fair, and cognitive functioning was intact. (R. 1346). On December 9, 2016, plaintiff reported his temper wasn't under control but his anxiety was. (R. 1348). Upon examination, plaintiff's mood was again "okay", affect was euthymic, insight and judgment were fair, and cognitive functioning was intact. (R. 1349-50). A week later, plaintiff's affect was reported to be "normal, amiable." (R. 1354). There were again no psychological complaints On

February 10, 2017. (R. 1357). On March 10, 2017, plaintiff reported that his temper was under control but his anxiety wasn't. (R. 1359). Dr. Ciasulli examination remained unchanged and unremarkable: "okay" mood, euthymic affect, fair insight and judgment, and intact cognition. (R.. 1360). There were, again, no psychological issues noted on May 12, 2017. (R. 1364-65).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "hoarseness/vocal fold paresis; degenerative disc disease of the lumbar spine; neck pain and an affective disorder." (R. 22). The ALJ found that plaintiff's sleep apnea was a nonsevere impairment. (R. 22). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for mental impairments. (R. 22-24). The ALJ determined that the plaintiff had a mild limitation in understanding, remembering, or applying information; a mild limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. (R. 22-23).

The ALJ then determined that plaintiff could perform light work with the following limitations:

> frequently operate hand controls with his right and left hand. The claimant can reach in all directions, including overhead, with his upper extremities on a frequent basis bilaterally. The claimant can handle, finger, and feel with his upper extremities on a frequent basis bilaterally. The claimant can never climb ladders, ropes, or scaffolds and he can occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant's range of motion in his neck is limited by roughly a third in all planes. He is limited to wo[r]k that does not involve more than occasional talking. The claimant can never work at unprotected

> heights, around moving mechanical parts and he can never be exposed to vibration. The claimant can never operate a motor vehicle. The claimant is limited to work involving only simple, routine tasks and simple work-related decisions. The claimant can occasionally respond appropriately to supervisors and coworkers and can never respond appropriately to the public. The claimant can tolerate few changes i[n] a routine work setting, which is defined as no more than five changes per workday.

(R. 24). In addition, the ALJ determined that the plaintiff's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 29). The ALJ explained that she accepted the plaintiff's alleged limitations "only to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 29). The ALJ then conducted a thorough and lengthy review of that evidence. (R. 25-33).

As for medical opinions, the ALJ gave the opinions from the state agency reviewing physicians "some weight." The ALJ found that those opinions, which found plaintiff capable of medium work, were not restrictive enough given the evidence received later on. (R. 31-32). The ALJ gave the opinions from the state agency reviewing psychologists "significant weight", and accepted them aside from finding plaintiff was unable to interact with the public. (R. 32). Finally, the ALJ gave "little weight" to the opinion from plaintiff's counselor that plaintiff was unable to function in a workplace. The ALJ gave more weight to the state agency psychologists because they were accepted medical sources with expertise in the Social Security disability program. (R. 32).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could not perform his past work as a sections manager, forklift operator, or corrections officer. (R. 33). The plaintiff could, however, perform other jobs that existed in significant numbers in the national

economy, such as: label coder packer (DOT #920.587-014, 37,800 jobs), small parts assembler (DOT #706.684-022, 14,500 jobs), or mail clerk (DOT#209.687-026, 32,800). (R. 34). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 34).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, at least thus far, the ALJ also has an obligation to build what the court has called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th

Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."[3] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record..."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

---

[3] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Point Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the "logical bridge" requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and

11

discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Id.*, at 287 (citations omitted). Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.* at 287-88. Given the record, and plaintiff's inability to point to evidence that shows he cannot perform the simple work the ALJ found he could perform, the ALJ has done enough here.

## III.

### A.

First, plaintiff argues that the ALJ's decision must be overturned because she listed "neck pain" as a severe impairment rather than degenerative cervical disc disease. [Dkt. #10, at 8]; R. 22. But, an ALJ's decision does not have to be perfect. *Schreiber v. Colvin*, 519 F. App'x 951, 962 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000) ("[W]e give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it.") (internal quotations and citation omitted). The ALJ thoroughly considered all the evidence, including the evidence related to plaintiff's neck issues, and accommodated them with a limitation of motion in her RFC finding. An ALJ adequately supports an RFC determination when they "consider all limitations supported by [the] record evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019). *See also Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020). That's just what the ALJ did here.

Moreover, even the evidence plaintiff cites to support his argument supports the ALJ's findings rather than undermine them. As the plaintiff submits, he was examined by Dr. Reza Dashti on April 14, 2015. Dr. Dashti specifically reported that, following cervical fusion and discectomy, "plaintiff's symptoms resolved to a big extent." (R. 410). Plaintiff did have neck pain and low back pain. (R. 410). Physical exam was generally normal: muscle strength was 5/5, sensation was normal, and reflexes were normal in upper and lower extremities. There was tenderness in the paravertebral muscles, and straight leg rasing was positive at 60 degrees on the left side. (R.410). X-ray showed loss of lordosis of cervical spine perhaps due to muscle spasm. (R. 411). So, plaintiff had significant resolution of his symptoms, although he was left with some neck pain and tenderness. Neither of those things undermines the ALJ's conclusion that plaintiff had neck pain that resulted in some limitation in his ability to work.

The same goes for plaintiff's reliance on the examination results from Dr. Lopez. On May 14, 2016, Dr. Lopez found that plaintiff's "range of motion of the cervical spine was *mildly* limited." (R. 536)(emphasis supplied). Plaintiff misrepresents this finding to the court – not once, but twice – as "limited", omitting the important qualifier of "mildly." [Dkt. # 10, at 4, 9]. Dr. Lopez's specific results underscore those misrepresentations and confirm that any limitation was, indeed, mild. Rotation was 65 degrees out of 80, lateral bending was 35 degrees out of 45, flexion was 45 degrees out of 50, and extension was 50 degrees out of 60. (R.540). Grip strength was 5/5 in both hands. (R. 536). Range of motion in the shoulders was normal. (R. 536). Motor strength was 5/5 in all extremities, and reflexes and sensation were, again, normal. (R. 537). These findings completely undermine plaintiff's contention that an ability to "reach[] in all directions is utterly inconsistent with the record, and it is unclear how she arrived at her calculation of the extent of limitation in

13

Plaintiff's range of motion in his neck." [Dkt. #10, at 9]. There is absolutely nothing in these reports that contradicts the ALJ's finding that plaintiff had a severe impairment of neck pain, or that the range of motion in his neck was limited by no more than a third in all planes. Similarly, the evidence plaintiff cites does not give any indication that he would have any limitations reaching or handling. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ruling any error in RFC harmless in part because plaintiff hypothesized no additional restrictions). Indeed, it seems as though plaintiff has ignored the very evidence that he cites.

## B.

The plaintiff's arguments regarding his mental impairments are similarly unpersuasive. First, plaintiff challenges the ALJ's finding that he was only mildly limited in understanding, remembering or applying information. [Dkt. #10, at 10]. The plaintiff complains that the ALJ undermined claims of memory problems with findings that "have nothing to do with memory," such as following instructions, paying attention at a hearing, or remembering medications or personal hygiene. [Dkt. #10, at 10]. While these may not be particularly challenging, they do have to do with memory, especially the findings. But that wasn't all the ALJ noted. She found most important plaintiff's psychiatrist's repeated findings that plaintiff's cognitive functioning was intact. (R. 22). The ALJ also referred to the psychiatrist's treatment notes (R. 22) and reviewed them nearly in their entirety. (R. 31). The fact is, there is simply not much there to suggest plaintiff is limited in understanding, remembering or applying information.

Plaintiff claims the ALJ ignored "made no mention of objective findings of only fair insight and judgment" or "impaired attention and concentration, and difficulty with serial sevens testing." [Dkt. #10, at 10]. But that claim is grounded in a less than careful reading of the ALJ's decision

because the ALJ clearly and specifically did mention these findings in her summaries of Dr. Ciasulli's exam and Dr. Schoenbach's consultative exam. (R. 30).

Plaintiff has a similar issue with the ALJ's finding that he had only a mild limitation in interacting with others. He complains that the ALJ based this finding "solely upon the fact that Plaintiff was never fired for that particular reason and was cooperative during medical appointments." [Dkt. #10, at 10-11]. But, that was the record before the ALJ. (R. 22, 29-30). It is, of course, the plaintiff's burden to prove he is disabled with medical evidence. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (noting that the claimant bears the burden of producing medical evidence sufficient to support a claim of disability). The only evidence plaintiff can muster that he was limited in this area are a couple of his own reports to Dr. Ciasulli that he felt irritable and the fact that his counselor, Mary Grant, checked off that he was unable to function in a competitive work environment. [Dkt. #10, at 11]. That is clearly inadequate.

First of all, plaintiff's review of the record is a bit inaccurate, likely thwarted by the state of the record. None of the portions of the medical record plaintiff cites say what he claims they do. Pages 1471-1472 are not from counselor Mary Grant and do not say plaintiff has any marked limitation in anything. Pages 1344-1347 – from November 11, 2016 – indicate that plaintiff said his mood was "okay," and the doctor observed his affect to be euthymic. (R. 1346). Temper was under control. (R. 1345). In December, plaintiff reported mood was "okay" and the doctor again found his affect euthymic. (R. 1349). Dr. Ciasulli's examination notes throughout this period are

15

unremarkable: mood was generally okay, affect was consistently euthymic, insight and judgment were consistently fair, and there were never any issues noted with cognitive abilities.

The plaintiff may have said he felt irritable in November 2016 and March 2017, but in a 1900-page record covering four years, two mentions of irritability to a psychiatrist is a far cry from disability due to a limitation in interacting with others.[4] Plaintiff points to nothing that would indicate he needed a greater restriction that the ALJ allowed him: "can occasionally respond appropriately to supervisors and coworkers and can never respond appropriately to the public." *See Taylor v. Kijakazi*, No. 21-1458, 2021 WL 6101618, at *2 (7th Cir. Dec. 22, 2021)("We have identified no material evidence overlooked or otherwise disregarded. And we see nothing compelling a finding that [plaintiff] requires greater functional limitations than those determined by the ALJ."); *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021) (plaintiff "has not pointed to any medical opinion or evidence to show [his impairments] caused any specific limitations"); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)("It is unclear what kinds of work restrictions might address [plaintiff's] limitations . . . because he hypothesizes none.").

It is true that plaintiff's attorney provided a checklist for his therapist on which she checked that he was unable to function in a competitive work environment – at page 1491 as opposed to 147-72 [Dkt. #10, at 5] – but she provided no explanation as to why she felt that was the case. Treatment notes specifically indicate plaintiff had no symptoms of social withdrawal (R. 1438). He had very good relationships with his spouse and children. (R. 1449). She listed one of his strengths as the ability to form and maintain relationships. (R. 1459).

---

[4] Irritability in the human species is hardly uncommon. Common sense dictates that there is not a person alive who has not experienced irritability and often with some frequency.

In the end, the counselor's checkmarks have nothing to do with her limited treatment records. She merely "expressed h[er] opinion by checking boxes rather than explaining how medical evidence supported his conclusions." *Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020). *See also Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)(checklist observations are ... "less useful to an ALJ" than a doctor's narrative summary). Actually, she provides further support for the ALJ's findings as she indicates plaintiff has no problem with concentrating or memory. (R. 1438, 1453). This is why – among other things – the ALJ gave no weight to the opinion. The ALJ contrasted it with the supported opinion of the state agency reviewer, who made a function-by-function assessment, rather than merely providing an unamplified bottom line. *See, e.g., Gedatus*, 994 F.3d at 905 (7th Cir. 2021)("The ALJ gave solid, substantiated reasons for giving more weight to the state-agency physicians' opinions . . . ."); *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021)("An ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes."); *Matthews v. Saul*, 833 F. App'x 432, 433 (7th Cir. 2020)(opinions of the agency doctors constitute substantial evidence to supports an ALJ's conclusion); *Turubchuk v. S. Illinois Asphalt Co., Inc.*, 958 F.3d 541, 554–55 (7th Cir. 2020)(". . . [a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

The plaintiff takes the ALJ to task for failing to mention every factor set out in 20 C.F.R. § 404.1527(f). But, an ALJ does not have to recite chapter and verse through all the considerations that go into assessing a physician's opinion, let alone a therapist's. *Henke v. Astrue*, 498 F. App'x 636, 639 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413, 415 (7th Cir. 2008). Here, it is clear

that the counselor's unsupported assertion was of little or no value.

## C.

Finally, plaintiff also complains that the ALJ did not follow through on a "boilerplate promise to include a more detailed assessment of the so-called paragraph B criteria for purposes of assessing RFC." [Dkt. #10, at 11]. But, yet again, plaintiff misreads the ALJ's decision. She not only discussed the mental impairment evidence – which clearly, was limited – at Step 3, but in her RFC determination as well. (R. 29-30). And, finally, plaintiff argues that limiting him to unskilled work "does not account for the deficits in concentration and attention that arise out of his debilitating mental impairments, and the side effects from medications used in an attempt to treat them." [Dkt. #10, at 12]. But as just seen, there is no medical evidence of "debilitating" mental impairments. In formulating an RFC, an ALJ need only account for those limitations supported by the medical evidence. *Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020); *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). That is what the ALJ did here.

Moreover, and more importantly, the ALJ drew her RFC from the opinion of the state agency reviewing psychologist. The state agency psychologist reviewed the evidence, including these two exams (R. 114), and translated them, along with the other findings, into an ability to understand, remember, and concentrate sufficiently to carry out one- and two-step instructions and sustain efforts for a normal work period; make work-related decisions; interact and communicate sufficiently with others in a work setting; and adapt to simple routine changes. (R. 122). The state agency reviewer's opinion provides substantial evidence to support the ALJ's RFC . *See, e.g., Pavlicek*, 994 F.3d at 783; *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Baldwin v. Berryhill*, 746 F. App'x

580, 584 (7th Cir. 2018).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #9] is denied, and the ALJ's decision is affirmed.

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 1/5/22

19